**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ARGENTINA JUAREZ-LOPEZ,

Defendant.

Case 5:25-CR-424 (BKS)

**MEMORANDUM OF LAW IN SUPPORT OF ARGENTINA JUAREZ-LOPEZ'S
MOTION TO SUPPRESS EVIDENCE**

i

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS. ............................................................................................................................... 3

I.     Issuance of the Warrants ...................................................................................... 3

II.    The Execution of the Warrants ........................................................................... 4

III.   Argentina's Actions on the Morning of September 4, 2025 ................................ 8

LEGAL STANDARD.......................................................................................................... 11

ARGUMENT ...................................................................................................................... 12

I.     Agents Violated Argentina's Fourth Amendment Rights When She Was Seized Without Any Evidence That She Had Committed Any Offense. ...................................................... 12

    A.    Argentina was seized before she was asked any questions......................................... 12

    B.    The Blackie's Warrant Cannot Justify Argentina's Seizure Because It Is An Unconstitutional General Warrant. ................................................................. 14

        1.    The Government cannot rely on administrative inspection warrants to conduct dragnets for persons in the context of criminal investigations. ............................ 14

        2.    Warrants to search for or seize persons in the context of a criminal investigation must meet the particularity requirements of the Fourth Amendment. .................. 17

    C.    Agents' execution of the administrative warrant exceeded its permissible scope by subjecting Argentina and every other NBC worker to non-consensual questioning without individualized reasonable suspicion. ............................................................. 19

    D.    The Rule 41 warrant to search for documents and information technology does not justify agents' mass seizure of every employee at the NBC factory for purposes of conducting an immigration raid. ................................................................. 21

II.    Argentina Was Arrested Without a Warrant or Probable Cause. ..................................... 24

III.   The Court Should Suppress Evidence Discovered after Argentina's Illegal Seizure ....... 26

# TABLE OF AUTHORITIES

**Cases**

8 U.S.C. § 1103 .................................................................................................... 18

*Abel v. United States*, 362 U.S. 217 (1960) ...................................................... 17

*Anobile v. Pellegrino*, 303 F.3d 107 (2d Cir. 2002) ......................................... 17

*Bailey v. United States*, 568 U.S. 186 (2013) ................................................... 21

*Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981) ........... 15, 19

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000) ................................... 13

*Cabral v. City of New York*, No. 12 CIV. 4659 LGS, 2014 WL 4636433 (S.D.N.Y. Sept. 17, 2014) ............................................................................................................... 21

*Camara v. Mun. Ct.*, 387 U.S. 523 (1967) ........................................................ 14

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ........................................... 19

*Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ..................................... 11

*Davis v. Mississippi*, 394 U.S. 721 (1969) ....................................................... 26

*Donovan v. Dewey*, 452 U.S. 594 (1981) .......................................................... 14

*Dunaway v. New York*, 442 U.S. 200 (1979) .................................................... 12

*Florida v. Royer*, 460 U.S. 491 (1983) ............................................................. 25

*Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013) ................... 12

*Groh v. Ramirez*, 540 U.S. 551 (2004) ............................................................. 17

*Hayes v. Florida*, 470 U.S. 811 (1985) ............................................................ 26

*Hernandez v. United States*, 939 F.3d 191 (2d Cir. 2019) ............................... 12

*Ill. Migrant Council v. Pilliod*, 531 F. Supp. 1011 (N.D. Ill. 1982) ............... 15

*In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025) ............... 15, 16

*In re Sealed Search Warrant Application*, 787 F. Supp. 3d 813 (S.D. Tex. 2025) ..................... 16

*INS v. Delgado*, 466 U.S. 210 (1984) .................................................. 19, 20, 21, 24

*INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984) ....................................................... 26, 28

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978).................................................. 14, 15

*Michigan v. Summers*, 452 U.S. 692 (1981) ............................................................ 21

*Pretzantzin v. Holder*, 725 F.3d 161 (2d Cir. 2013) .................................................. 27

*Segura v. United States*, 468 U.S. 796 (1984) ........................................................ 26

*Steagald v. United States*, 451 U.S. 204 (1981)................................................... 17, 19

*Terry v. Ohio*, 392 U.S. 1 (1968) ......................................................................... 13

*United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) ............................................. 18

*United States v. Herron*, 18 F. Supp. 3d 214 (E.D.N.Y. 2014) ................................... 12

*United States v. Hightower*, 950 F.3d 33 (2d Cir. 2020) ........................................... 26

United States v. Jaramillo 25 F.3d 1146 (2d Cir. 1994) ......................................... 16, 17

*United States v. Martinez-Rodriguez*, -- F. Supp. 3d --, No. 1:25-CR-00200 (AMN), 2025 WL 2355630 (N.D.N.Y. July 23, 2025)........................................................ 29, 30

*United States v. Morales-Lopez*, 5:25-CR-94, ECF 47 (BKS) (N.D.N.Y. May 5, 2025)....... 27, 29

*United States v. Murphy*, 778 F. Supp. 2d 237 (N.D.N.Y. 2011), *aff'd*, 703 F.3d 182 (2d Cir. 2012) ................................................................................................. 12

*United States v. Navarro-Diaz*, 420 F.3d 581 (6th Cir. 2005)...................................... 28

*United States v. Ortiz-Hernandez*, 427 F.3d 567 (9th Cir. 2005) ................................. 28

*United States v. Patterson*, 25 F.4th 123 (2d Cir. 2022)........................................... 14

*United States v. Simmons*, 560 F.3d 98 (2d Cir. 2009)........................................ 12, 13

*United States v. Sugrim*, 732 F.2d 25 (2d Cir. 1984) ............................................... 18

*Utah v. Strieff*, 579 U.S. 232 (2016) ..................................................................... 26

*Ybarra v. Illinois*, 444 U.S. 85 (1979) .................................................................. 18

**Statutes and Rules**

8 U.S.C. § 1252............................................................................................... 15

8 U.S.C. § 1304 ........................................................................................... 16

8 U.S.C. § 1324a(a) ..................................................................................... 15

8 U.S.C. § 1324a(f)(1) .................................................................................. 15

8 U.S.C. § 1326 ........................................................................................... 16

8 U.S.C. § 1342a(f)(2) .................................................................................... 3

8 U.S.C. § 1357 ....................................................................................... 3, 18

8 U.S.C. § 1357(a)(2) ..................................................................................... 3

Fed. R. Crim. P. 41 ..................................................................................... 16

Fed. R. Crim. P. 41 Advisory Committee Note (1979) ............................... 15

**Constitutional Provisions**

U.S. Const. amend. IV .......................................................................... passim

## INTRODUCTION

Early in the morning on September 4, 2025, dozens of state and federal law enforcement agents converged onto a family-owned granola bar factory in Cato, New York, as part of a criminal investigation into the employment of unauthorized workers. Armed with an administrative and Rule 41 search warrant—but no arrest warrants—agents entered through the front and rear of the factory and quickly seized every person found within. Body worn camera footage shows waves of federal agents bearing arms and dressed in military-style bullet-proof jackets moving through the factory herding employees from their workstations to the cafeteria/breakroom. During the search, several male agents kicked down the door of the women's bathroom to remove two people and escort them to the breakroom. Once in the breakroom, agents ordered the employees to sit down and stay quiet. Thereafter, agents systematically forced every person to engage in a nonconsensual conversation with a law enforcement officer. The interrogations were brief and sometimes only consisted of one-word questions like "Documents?" or "Illegal?" In total, law enforcement arrested 57 people for being illegally present in the United States.

Argentina Juarez-Lopez was one of those 57 people. When law enforcement burst through the doors of the factory, Argentina was working on the production line. Within seconds of officers entering the factory, Argentina encountered an armed agent wearing a mask and body armor. She was directed to move quickly to the breakroom where she was held. When it was Argentina's turn to speak with law enforcement, she calmly and clearly asked for a lawyer and said nothing else. In reports detailing her arrest, agents inexplicably claim that Argentina "freely admitted to being in the United States illegally" and not possessing "immigration documentation that would allow her to enter or remain in the United States legally." Likewise, in the affidavit in support of the original criminal complaint, the officer claimed that "Agents determined [Argentina] is a citizen of

Guatemala and is present in the United States illegally," "[w]hile on-scene[.]" But Argentina's only interaction with law enforcement agents was captured on bodycam and clearly contradicts these statements. Federal agents never learned Argentina's name, country of origin or immigration status while at the factory.

Despite failing to develop any supporting facts, Argentina was arrested and transported in shackles to the Oswego Border Patrol Station. It was only there that she provided her name, and agents took her photo and her fingerprints. After obtaining this information and forming an intention to charge her, she was held in a small cell at the Station for four days before she was brought before a federal magistrate judge in Syracuse, New York for her initial appearance.

The constitutional violations at issue in this case are diverse, plentiful, and compounding. As discussed in detail herein, federal agents gained entry to the facility in part based on an administrative "*Blackie's*" warrant. The *Blackie's* warrant, which should never have been issued, granted law enforcement the authority to perform a factory survey and engage in "consensual" conversations with employees. The *Blackie's* warrant could not authorize the immediate mass seizure of all employees at the factory followed by nonconsensual questioning. However, that is exactly what happened here.

Further, even if law enforcement was entitled to be present at the factory, they failed to establish the requisite level of individualized factual support to justify seizing Argentina. Law enforcement first detained Argentina arbitrarily and then arrested her without knowing her name or immigration status. It was only after Argentina was handcuffed and taken to the Station that law enforcement learned who she was and matched her fingerprints to her immigration file.

Given her unlawful seizure, Argentina now moves the Court to suppress evidence developed after her illegal seizure. Specifically, the government should be prevented from

2

introducing at trial Argentina's statements, fingerprints, a photo taken of her, any report of investigation, and the immigration file that is linked to those fingerprints.

## FACTS

### I.    Issuance of the Warrants

On August 28, 2025, a magistrate judge in the Northern District of New York signed two related warrants. First, there was an Administrative Search Warrant that permitted law enforcement to: (1) "enter and search [Nutrition Bar Confections factory in Cato New York (the "factory" or "NBC")] for aliens unlawfully within the United States;" (2) take such actions with respect to aliens unlawfully in the United States as authorized by [8 U.S.C. §§ 1357 and 1342a(f)(2)];" and (3) "further investigate into a pattern or practice of employing unauthorized aliens under [8 U.S.C. §§ 1357 and 1342a(f)(2)]." *See* Exs. 1 and 3 to Tuck Aff. Accompanying that warrant and application, the government provided a memorandum of law in support of the issuance of the warrant. *See* Ex. 2 to Tuck Aff. The memorandum provided argument related to the legality of the nature of the administrative warrant and described that the warrant would authorize agents to enter the factory and to engage "in systematic *consensual* questioning of employees" and to seize employees if the agents "possess reasonable, articulable and individualized suspicion of violations of immigration or criminal law." *Id*. at 6 (emphasis added). The memorandum also contended that agents may "make warrantless civil immigration arrests of aliens unlawfully present in the United States based on probable cause." *Id*. at 7 (citing 8 U.S.C. § 1357(a)(2)).

In addition to an administrative warrant, law enforcement obtained a Rule 41 warrant to search the factory in Cato New York, for evidence of criminal activity related to hiring illegal aliens and identification document fraud. *See* Exs. 4 and 5 to Tuck Aff. The Rule 41 warrant's Attachment B listed dozens of categories of documents and things that law enforcement was planning to search

for and seize in relation to a criminal investigation. *See* Ex. 4. Notably, the Rule 41 warrant was limited to authorizing law enforcement to search for and seize tangible things, but it did not authorize agents to search for or seize people.

## II.     The Execution of the Warrants

On September 4, 2025, law enforcement officers from at least a half a dozen different agencies engaged in a highly coordinated operation to execute the warrants. At approximately 9:19am, agents arrived at the front of the factory and began banging at the door. *See* Ex. 9 to Tuck Aff. at 9:19.[1] Shortly after arriving, an employee of the factory unlocked the main door and allowed agents to enter. *See id*. at 9:20. According to the report of investigation, agents gained entry through the rear doors at the same time and started sweeping the facility. *See* Ex. 6 to Tuck Aff. at 2.[2] When agents entered, they told an employee that they needed to make an announcement over the intercom system for all employees to go to a breakroom. *See* Ex. 9 to Tuck Aff. at 9:20.

Upon entry, multiple agents swarmed through the hallways into the production area and breakroom. *See* Exs. 10, 12 to Tuck Aff. at 9:20-21. Bodycam footage shows a female agent entering the breakroom where multiple people appear to be having lunch. *See* Ex. 10 at 9:20. That footage, shows a woman trying to stand up. *See id*. The agent immediately said, "stay here" and then walked into the breakroom where there were more than a dozen employees. *See id.* The agent then stated "everyone stay here" multiple times to the people in the room and ordered people to sit down in Spanish and English. *See id*. at 9:20-21. Several agents can be seen on camera standing at

---

[1] Citation to the body worn camera footage is approximate and to the minute based on the time stamped in the upper-right hand corner of the videos.

[2] There is no footage from the agents who gained access to the rear of the factory. Though there were dozens of law enforcement agents on the scene, it appears only approximately 10 federal agents wore or activated their body camera.

the doors making sure people do not leave the breakroom. *See id*. at 9:21. The female agent walked

away and told another agent to "get people to the breakroom." *See id*.

      At 9:21, a male agent entered a women's bathroom to look for employees and said "police,

search warrant." *See* Ex. 12 at 9:21. The agent entered the bathroom and told a person who was

using a stall that he could "see her." *See id.* The male agent continued to yell at her to get out of

the stall. *See id*. at 9:21-22. After a few seconds, the agent entered the stall next to the one where

the woman was, climbed on the toilet to peer over the door, and told the woman to leave the stall.

*See id*. at 9:22. When the woman complied, she was then escorted to the breakroom. *See id*. Shortly

after, agents went into the men's bathroom and ordered someone to get out of the stall and to go

to the breakroom. *See id*. at 9:23.

      At 9:23, a female agent told other agents that she was going to the production line from the

breakroom. *See* Ex 10 to Tuck Aff. at 9:23. The female agent walked behind plastic curtains and

into the production area and started funneling all employees towards the breakroom. *See id*. One

person appeared to have left through a garage door, and the female agent followed, found other

employees, and started yelling at people to go to the breakroom. *See id*. at 9:23-24. At one point,

the agent can be heard claiming that people need to go to the breakroom "for safety." *See id*. At

9:24, employees can be seen in a line hanging up their white robes and proceeding towards the

breakroom under escort. *See* Ex. 12 to Tuck Aff. at 9:24.

      At 9:26, a female factory employee told an agent that there were people in a different

women's bathroom. *See* Ex. 9 at 9:26. The agent called for assistance and went directly to the

women's bathroom door, attempted to open it, and found that it was locked. *See id*. Another agent

who was wearing a mask arrived and knocked on the door and said "open the door now" in

Spanish. *See id*. at 9:26-9:27. Another agent tried to knock on the door again and an agent can be

5

heard saying "there is resistance," another agent in the background said, "I think I just heard a flush." *See id*. at 9:27. Immediately after, one agent used his foot to violently kick open the door and screamed "GET DOWN, GET ON THE FLOOR." *See id*. The agent, seemingly realizing that there were women using the bathroom, said "female, female, female" and then "Miss, pull up your pants and come out of the bathroom." *See id*. In Spanish, the woman responded that she needed a minute to pull her pants up because she "can't come out like this." *See id*. Another agent told the women to follow his partners away from the bathroom and the agent wearing the bodycam left the restroom. *See id*.

At 9:29, there were now 5-10 agents stationed at the breakroom inside and outside of the room to keep people inside. *See* Ex. 10 to Tuck Aff. at 9:29.

At 9:30, there was an order to conduct "secondary" searches of the factory to try and find any employee who was not captured in the first sweep. *See id*. at 9:30.

At 9:35, a female agent told an employee who was wandering near the breakroom to "go back in line" and that they "need everyone who works here, here." *See id*. at 9:35-36.

At 9:36, a female agent peered into the crowded breakroom and there are now between 50-60 people sitting on chairs and standing around. *See id*. at 9:36. There were at least 6 agents stationed at the doors blocking any attempt to exit the breakroom. *See id*. There were also other employees standing outside the breakroom and in the storage room immediately adjacent. *See id*.

At 9:36, agents started to tell employees that if they are a non-supervisor U.S. Citizen, they can move from the breakroom into a different staging area. *See id.* at 9:36. All supervisors were told to stand in the hallway. *See id*. at 9:37. Another group of people who claimed to have work permits were being questioned in Spanish near an area with boxes and pallets. *See id*. at 9:37. As some employees were being directed to walk from the breakroom, a female agent said "let's not

6

let them walk willy-nilly" because they had yet to question everyone and she wanted to keep track of the way they were separating groups. *See id.* at 9:38.

At 9:38, an agent can be seen at one of the doors to the breakroom and said, "if you're a US citizen, come up here." *See* Ex. 11 to Tuck Aff. at 9:38. As people approached this officer at the door, he asked if the individuals were a US citizen and if they were a supervisor. *See id*.

At 9:40, several agents discussed how people were being sorted. *See* Ex. 10 to Tuck Aff. at 9:40. The agents had, at this time, separated people who affirmatively claimed to be U.S. citizens in one group, people who claimed to have work authorization in another group, and the rest of the employees in another group. *See id*. The female agent decided to put all the employees who were not citizens but claimed work authorization back into the breakroom. *See id*. An agent can be heard explaining to those employees to form a line and go back into the breakroom. *See id*.

Outside of the breakroom at 9:40, an employee of the factory informs several agents that the machines in the factory have been shut down. *See* Ex. 11 to Tuck Aff. at 9:40.

In the breakroom at 9:41, an agent can be heard giving instruction to people who had yet to be talked to. *See* Ex. 10 to Tuck Aff. at 9:41. At this time, agents ordered everyone in the breakroom to one side and had them cram together and get in a line to be interrogated. *See id*. When employees were moving across the room slowly, an agent with a green bullet proof vest and a gun on his hip yelled at everyone to pay attention and move over. *See id*. at 9:42. A female agent told people to calm down and that the agents will "talk to you guys individually." *See id*. The same agent asked another officer to make sure that people stay separated. *See id*. Notably, agents can be seen releasing some citizen-employees out of the factory at 9:50. *See* Ex 10 to Tuck Aff. at 9:50.

There is body cam footage of the individual interviews of the employees who were crammed into the breakroom. *See* Exs. 10 and 11 to Tuck Aff. For example, an agent in a green

uniform asked about someone's immigration status and the employee told the agent "I cannot answer anything, can I call my attorney?" and the agent tells her "No, answer me right now." *See* Ex. 11 to Tuck Aff. at 9:44. In another interaction, an agent questions a young male in a white shirt, the male states that he does not wish to answer questions. *See id.* at 9:45. In response, the agent tells the person to go to the other side of the room. *See id.*  Likewise, an agent questions an individual and asks if she has "documents" and she responds that she "cannot answer that." *See id.* at 9:52. In response, the agent tells her to move to the other side of the room. *See id.* As the interrogations continue, the agents' questions become more clipped . *See id.* at 9:53. Specifically, the agents start just asking "Document?" "Illegal?" and the agent then points to the person to move to the other side of the room. *See id.* During the interrogations, multiple agents were stationed at the breakroom doors ensuring people do not leave. *See* Exs. 10, 11, 12, and 13 to Tuck Aff.  After the employees had been categorized inside the breakroom they were kept there until they were transported group-by-group out of the facility. *See* Juarez-Lopez Aff. at 18. There is no additional body camera footage from the breakroom after the agents interrogated each employee individually.

At approximately 10:15, agents met to coordinate the Rule 41 search for documents. *See* Ex. 9 to Tuck Aff. at 10:15-16. Agents discussed the plan to search within the building and were going to get the search team together to divide the work. *See id.* at 10:15.

### III.    Argentina's Actions on the Morning of September 4, 2025

Argentina was stationed in the production area in the morning on September 4, 2025. *See* Juarez-Lopez Aff. at 4. Shortly after 9:15, she heard commotion and saw a co-worker running through the production area stating that police had entered the factory. *See id.* at 5.  At this point, Argentina left her post at the machine and shortly thereafter encountered a police officer walking towards her. *See id.* at. 6. Argentina remembers that the police officer wore a hat, a mask that

covered his face, and had what looked like military-style body armor on his chest. *See id.* Argentina heard him say "Stop." *See id.*

At that point, Argentina turned and started walking towards another area of the factory where she was met by another police officer. *See id.* at 7. This officer looked like the first officer and was wearing military-style body armor and was wearing a handgun on his leg. *See id.* When Argentina saw this officer, she stopped. *See id.* at 8. That officer started making hand gestures to tell Argentina and others that they needed to move towards the breakroom. *See id.*

Argentina remembers seeing between 10-15 other officers in the production area of the factory. *See id.* at 9. Argentina noted that the officers were all wearing military-style body armor and wore handguns on their legs. *See id.* Argentina was corralled together with other employees into a line, moved to the breakroom, and, once there, she was not allowed to leave. *See id.* at 10. Argentina "complied with the officer's hand gestures and commands to move to the cafeteria area because [she] did not feel like [she] had any other choice." *Id.*

When Argentina arrived at the breakroom, she recalled seeing 40-50 other employees already crammed into the room. *See id.* at 11. She noted that, among the people in the cafeteria, there were multiple police officers wearing guns and military style body-armor and several police officers were standing near the doors to the cafeteria making sure people could not leave. *See id.* According to Argentina, it was "chaotic in the room, crowded, and hot." *See id.* at 13. When she was in the breakroom, Argentina could hear police officers yelling at employees to "sit down" and "stay here." *See id.* Argentina noted that she was moved into a corner of the room and told that each person would have to speak with an officer individually. *See id.*

Argentina spoke with an agent at approximately 9:52am. *See* Ex. 13 at 9:52. The officer who spoke to Argentina was wearing an all-green military-style uniform with a gun on his hip. *See*

*id*; *and see* Juarez-Lopez Aff. at 14. The agent asked what country Argentina was from and Argentina responded that she wanted to speak to a lawyer. *See* Juarez-Lopez Aff. at 15; *and see* Ex. 13 at 9:52; Costa Aff at 5. The agent then asked if Argentina had "documents" and Argentina politely reiterated that she wanted to speak to an attorney. *See* Juarez-Lopez Aff. at 15; *and see* Ex. 13 at 9:52; Costa Aff. at 5. Argentina was told to move to the other side of the room. *See* Juarez-Lopez Aff. at 15; *and see* Ex. 13 at 9:52. She was questioned for about 9 seconds. *See* Ex. 13 at 9:52.

Besides this brief interaction, Argentina did not have any other conversations with any police officers while she was in the breakroom. *See* Juarez-Lopez Aff. at 16. As confirmed by the body-cam footage, Argentina did not admit to being in the country illegally nor did she admit to not having any documents that would allow her to enter or remain in the United States legally. *See* Juarez-Lopez Aff. at 17; *and see* Ex. 13 at 9:52. No officer learned her name, country of birth, immigration status, or any other information about Argentina while she was at the factory.

After Argentina's interaction with the officer, she had to wait in the breakroom for at least an hour before she was removed and escorted to the entrance of the factory along with several other female coworkers. *See* Juarez-Lopez Aff. at 19. When she made it to a van, officers handcuffed and shackled Argentina for transport. *See id*. at 20.

Argentina was taken to the Oswego Border Patrol facility. *See* Ex. 7 to Tuck Aff. at 3. When inside the facility, she was given a piece of paper and told to write her name, date of birth, and to list any family she had in the United States. *See* Juarez-Lopez Aff. at 23. Argentina wrote her name and date of birth. *See id*. After that, police officers took a picture of Argentina's face and took her fingerprints. *See id*.

According to immigration records, Argentina had been removed from the United States on June 14, 2024, via Harlingen, Texas Port of Entry to Guatemala. *See* Ex. 7 to Tuck Aff. at 3. The I-213 report created regarding Argentina's interaction with immigration officials states that she is "being held pending prosecution for 8 USC 1326 reentry of removed aliens." *See id*. at 4. As noted above, the I-213 also falsely stated that, *while at the factory*, Argentina "freely admitted to being in the United States illegally" and not possessing "immigration documentation that would allow her to enter or remain in the United States legally." *See id*. at 3.

While in custody, Argentina was treated poorly. She "was not allowed to make any phone calls[;] permitted to go outdoors or leave the cell[; or] permitted any reading materials or other entertainment." *See* Juarez-Lopez Aff. at 28. Argentina reported that the "cell was extremely small and consisted of only a toilet, water fountain, and a small bench." *Id*. Argentina noted that the "officers gave [her] a foam mattress and blanket to sleep but there was not enough room to fully lay out." *Id*.

On September 8, 2025, after spending more than four days in the Oswego Border Patrol Station, Argentina was taken to federal court in Syracuse where she had an initial appearance on a criminal complaint charging her with illegal reentry in violation of 8 U.S.C. § 1326. In the affidavit in support of the original criminal complaint, the officer claimed that "Agents determined [Argentina] is a citizen of Guatemala and is present in the United States illegally," "*[w]hile on-scene*[.]" *See* Dkt. No. 1 (emphasis added). However, Argentina's only interaction with law enforcement agents was captured on bodycam and clearly contradicts this statement.

**LEGAL STANDARD**

The Fourth Amendment prohibits unreasonable seizures. U.S. Const. amend. IV. "[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike." *Cotzojay v.*

11

*Holder*, 725 F.3d 172, 181 (2d Cir. 2013). On a motion to suppress, the defendant has the initial burden of showing that they have been subject to a warrantless seizure. *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Once the defendant has met that burden, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the challenged seizure did not violate the Fourth Amendment. *See United States v. Murphy*, 778 F. Supp. 2d 237, 240 (N.D.N.Y. 2011), *aff'd*, 703 F.3d 182 (2d Cir. 2012).

## ARGUMENT

I.    **Agents Violated Argentina's Fourth Amendment Rights When She Was Seized Without Any Evidence That She Had Committed Any Offense.**

A.    **Argentina was seized before she was asked any questions.**

"Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'" *Hernandez v. United States*, 939 F.3d 191, 201 (2d Cir. 2019) (quoting *Dunaway v. New York*, 442 U.S. 200, 214-15 (1979)). The test for whether an investigatory detention "has taken place in the context of a police encounter is whether a reasonable person would have felt free to terminate the encounter." *Floyd v. City of New York*, 959 F. Supp. 2d 540, 567 (S.D.N.Y. 2013). The Second Circuit has held: "[a] seizure occurs when [] a person obeys a police officer's order to stop.'" *United States v. Simmons*, 560 F.3d 98, 101 (2d Cir. 2009). Only a minimal level of officer coercion is required for an encounter to escalate into a seizure for Fourth Amendment purposes. Among the "pertinent" circumstances that courts consider in determining whether a seizure has occurred are "the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone

12

indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room." *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000).

The entire workforce at NBC was seized when dozens of agents wearing body armor and visible weapons entered the plant and ordered all employees into the breakroom. The entry and seizure was aggressive and immediate. Armed male agents kicked in the door of a women's bathroom stall to reveal a woman on the toilet with her pants down, whom they ordered to go the breakroom. *See* Ex. 9 to Tuck Aff. at 9:26. The agents made clear that *every* employee of the factory needed to be in the breakroom area and made sweeps through the factory to ensure those orders were followed. *See* Ex. 10 to Tuck Aff. at 9:35-36; 9:30.

Argentina was first seized shortly after agents gained entry to the factory after 9:15am. As she described, one agent told Argentina to "stop," and a second officer directed her and other workers to the breakroom using hand gestures. *See* Juarez-Lopez Aff at 6-8. Similar facts were sufficient to find a seizure in *Simmons*, 560 F.3d at 101 (finding a seizure based on a person complying with an officer's second order to "stop"). The seizure intensified when she and scores of other workers arrived in the breakroom where 5-10 agents were stationed to keep people at that location. *See* Ex. 10 at 9:29. Inside the breakroom, agents delivered commands to "sit down" and "stay here" in loud tones of voice. Agents informed employees that they would have to speak to an officer individually. *See* Juarez-Lopez Aff. at 13. When Argentina was finally ordered to speak with an officer, she could see that he was visibly armed. *See id.* at 14.

Argentina was the victim of a dragnet seizure of all employees at the factory without any factual support. At minimum, officers required reasonable suspicion to justify Argentina's seizure.

13

*See Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) ("law enforcement officials must have a reasonable basis to think that *the person to be detained* is committing or has committed a criminal offense") (emphasis added) (internal quotation marks omitted). However, the facts described above occurred before officers had asked Argentina any questions or knew anything about her except that she worked at the factory. Thus, Argentina was seized for Fourth Amendment purposes as early as minutes after officers first entered the factory and certainly before any questioning occurred without reasonable suspicion.

The inquiry then turns to whether there was any other possible justification for her seizure—there was not.

### B.    The *Blackie's* Warrant Cannot Justify Argentina's Seizure Because It Is An Unconstitutional General Warrant.

Here, law enforcement did not have an arrest warrant for Argentina or any other workers at the factory. Instead, the search for and mass seizure of the NBC workforce was conducted pursuant to an administrative *Blackie's* warrant that lacked the particularity and individualized probable cause the Fourth Amendment requires. This warrant should never have been issued, and even if it was valid, the government utterly failed to execute it faithfully.

#### 1.    The Government cannot rely on administrative inspection warrants to conduct dragnets for persons in the context of criminal investigations.

In a narrow set of contexts, the Supreme Court has allowed "administrative" warrants for regulatory inspections of property—for example, housing-code or OSHA inspections—based on reasonable, neutral administrative standards instead of traditional, individualized probable cause. *See Camara v. Mun. Ct.*, 387 U.S. 523, 534–39 (1967); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–25 (1978); *Donovan v. Dewey*, 452 U.S. 594, 598–603 (1981). Those cases involved agency

14

officials entering premises to inspect conditions, equipment, or records under comprehensive regulatory schemes, and they emphasized that even administrative inspections must be limited in time, place, and scope. *See Barlow's*, 436 U.S. at 320–21. Nothing in that line of authority suggests that lower administrative standards may be used to authorize dragnets for people for the purpose of subjecting them to seizure for criminal liability. *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 972 (S.D. Tex. 2025). This distinction makes sense. "People are not documents or safety hazards." *Id.* at 975 (rejecting a similar application for administrative warrant to search a worksite for unauthorized workers).

In its memorandum of law in support of its administrative warrant, the government relies on *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981), but the Second Circuit has not endorsed *Blackie's* and there is good reason to decline to follow it. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d at 973-975; *see also Ill. Migrant Council v. Pilliod*, 531 F. Supp. 1011, 1020-21 (N.D. Ill. 1982)). In *Blackie's*, the D.C. Circuit invented a new species of administrative warrant that permitted immigration agents to enter a worksite and search for unauthorized workers, predicating its decision on a finding that there were "no sanctions of any kind, criminal or otherwise, imposed by law upon a knowing employer of illegal aliens[.]" 659 F.2d at 1218. But that premise collapsed in 1986 when Congress for the first time imposed criminal penalties on employers for hiring unauthorized workers. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d at 973 (citing 8 U.S.C. § 1324a(a), (f)(1)).[3] Moreover, *Blackie's* did

_____

[3] Furthermore, Magistrate Judge Edison noted that the *Blackie's* court missed that in relation to 1979 amendments to Rule 41, the Advisory Committee specifically identified "the arrest of a deportable alien under 8 U.S.C. § 1252, whose presence at a certain place might be important evidence of criminal conduct by another person" as within the scope of the Rule's authorization

not grapple with the fact that Federal Rule of Criminal Procedure 41—not the Immigration Nationality Act or the All Writs Act—is the express and proper source of authority "for obtaining a warrant 'to search for or seize a person.'" 784 F. Supp. 3d at 974. And as Magistrate Judge Edison correctly observed, "an alien is a person." *Id*. at 971.

Today, there is no doubt that worksite immigration "inspections" are inextricably bound up with potential criminal penalties against employers and employees, underscoring why administrative standards cannot substitute for person-specific probable cause in workplace raids. Indeed, the Southern District of Texas drove this point home in refusing *twice* to issue administrative warrants similar to the one at issue here. 784 F. Supp. 3d at 971; *see In re Sealed Search Warrant Application*, 787 F. Supp. 3d 813, 817 (S.D. Tex. 2025) (rejecting an "identical warrant" and "nearly identical warrant application").

The validity of the administrative search warrant in this case should be similarly rejected as a basis for the seizure. Here, the government was conducting a criminal investigation of the factory owners for employing undocumented workers. *See* Exs. 4, 5 to Tuck Aff. The government was also investigating criminal or civil immigration offenses by the employees. *See* Ex. 2 to Tuck Aff. at 6 (citing 8 U.S.C. § 1304 and 8 U.S.C. § 1326). Given the "inherently criminal" nature of this investigation, the government should have obtained a particularized Rule 41 warrant to search for and seize persons for whom they had the requisite degree of individualized probable cause. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d at 975. An administrative search warrant cannot provide a convenient end run around those safeguards. *Id.*

---

of warrants "to search for and seize a person." 784 F Supp. 3d at 974 & n.3 (quoting Fed. R. Crim. P. 41 Advisory Committee Note (1979)).

16

The Second Circuit's own cases reinforce the point. In *United States v. Jaramillo*, officers conducting a bar raid in Queens ordered all patrons to the wall and frisked everyone, discovering a firearm on Mr. Jaramillo. 25 F.3d 1146, 1148–49 (2d Cir. 1994). The court held the search unconstitutional, stressing that "any invasion of a person's Fourth Amendment interests must be justified at least by specific and articulable facts directed to the person whose interests are to be invaded" and that a general sweep of everyone present is impermissible. *Id.* at 1151–52 (cleaned up) (citing *Ybarra*). In *Anobile v. Pellegrino*, the Circuit invalidated purported regulatory inspections that were in fact general criminal sweeps, emphasizing that administrative schemes cannot be used as a pretext to evade ordinary Fourth Amendment limits. 303 F.3d 107, 122–23 (2d Cir. 2002); *see also Abel v. United States*, 362 U.S. 217, 226 (1960) ("[T]he deliberate use of an administrative warrant for the purpose of gathering evidence in a criminal case must meet stern resistance by the courts.").

Those principles apply fully here and the *Blackie's* warrant should never have been issued because this immigration operation was inherently a criminal investigation.

> 2.    **Warrants to search for or seize persons in the context of a criminal investigation must meet the particularity requirements of the Fourth Amendment.**

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Particularity is one of the bulwarks of constitutional liberty, designed to prevent the "general warrants" and writs of assistance that allowed officers to search for and seize whomever they wished. *See Groh v. Ramirez*, 540 U.S. 551, 559–63 (2004). A warrant that "specifie[s] only an offense" and leaves to the "discretion" of officers "the decision as to which

17

persons should be arrested and which places should be searched" is exactly the sort of general warrant the Amendment forbids. *Steagald v. United States*, 451 U.S. 204, 220 (1981) (cleaned up).

That principle applies with special force to warrants that purport to authorize a search for or seizure of persons because "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Immigration enforcement is no different, and search and seizure authority is still exercised through a person-specific process. *See United States v. Sugrim*, 732 F.2d 25, 29–30 (2d Cir. 1984) (holding in the immigration context, seizures are permissible "only if [officers] are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the [person to be stopped] may be illegally in the country.") (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).

The administrative warrant in this case is fundamentally inconsistent with the Fourth Amendment because it functions as a general warrant to investigate criminal activity. In its application, the government sought authority to search the entirety of the NBC property to engage in "systematic consensual questioning" of the entire NBC workforce for evidence concerning any immigration law violation, including *at least* two potential criminal violations: (1) an alien's failure to carry immigration documents on their person, a misdemeanor; and (2) unlawful re-entry, a felony. *See* Tuck Aff. at Ex. 2, MOL at 6. The administrative warrant authorized agents to "search . . . for aliens present unlawfully in the United States" with no further specificity as to the people who would be subject to that intrusion. *See* Tuck Aff. at. Ex. 1. And the administrative warrant authorized agents "[to] tak[e] such actions, with respect to any such aliens present there, as are authorized by law," citing 8 U.S.C. §§ 1103 and 1357, which are simply general provisions about enforcing immigration law. *See* Tuck Aff. at. Ex. 1.

18

These terms clearly operate as a general warrant. In substance, the administrative warrant "specif[ied] only an offense"—in fact, a vast and unspecified set of potential criminal and civil violations of immigration law—and left "to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald*, 451 U.S. at 220. The warrant supplied an indeterminate category of people—"aliens present unlawfully"—and then left agents to decide during a militarized raid which workers "fit" that category, resulting in a seizure of the entire workforce, including U.S. citizens as well as non-citizens of every status. The agents exercised unfettered discretion in their tactics to try to uncover any violation of immigration law, including barging into bathrooms and kicking in toilet stall doors. That is the exact sort of "general, exploratory rummaging" that the Fourth Amendment was designed to prevent. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

C.    **Agents' execution of the administrative warrant exceeded its permissible scope by subjecting Argentina and every other NBC worker to non-consensual questioning without individualized reasonable suspicion.**

Even assuming the continuing vitality of *Blackie's*, such a general administrative search warrant can only authorize "consensual questioning" of employees; the non-consensual questioning to which Argentina was subjected required further individualized suspicion. The government's memorandum of law in support of the search warrant application represented as much: "During the execution of a civil administrative search warrant such as the one requested, agents may engage in systemic *consensual questioning of employees*." *See* Tuck Aff. at Ex. 2, MOL at 6 (citing *INS v. Delgado*, 466 U.S. 210, 216—19 (1984)) (emphasis added).

The facts leading to Argentina's questioning stand in stark contrast to the "classic consensual encounters" that the Supreme Court permitted in *Delgado*. 466 U.S. 210, 212–14 (1984). In *Delgado*, INS agents conducted "factory surveys" at several plants during which they

19

questioned workers about immigration status while production continued. 466 U.S. 210, 212–14 (1984). In that case, "[t]he record indicates that when these surveys were initiated, the employees were about their ordinary business, operating machinery and performing other job assignments" and "workers were not prevented from moving about the factory." *Id.* at 218. Having considered those circumstances, *Delgado* stated that no detention occurs in a factory survey as long as INS agents' conduct has "given [workers] no reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer." *Id*. But *Delgado* also recognized that where a worker merely "refuses to answer," but does not attempt "to flee or evade the agents," any "additional steps" taken by the agents must be supported by "some minimal level of objective justification to validate the detention or seizure." *Id.* at 216—17, 220.

The exact opposite of *Delgado* took place here. Armed agents shut down production and aggressively herded every single worker at NBC into the breakroom for questioning; a far cry from the "classic consensual encounter[s]" the Court described in *Delgado.* 466 U.S. at 221. During the roughly half-hour from when Argentina first realized officers had entered the factory until the moment before she was questioned, agents repeatedly communicated to her that she was not free to leave. The agents did so through the sheer numbers of officers, their visible weapons, their commands limiting workers' movements, their directives confining all workers to the breakroom, and their sweeps to ensure that every worker was, in fact, confined to the breakroom. And, as discussed in Section II *infra*, when she did refuse to answer agents' questions and instead asked for a lawyer, she was promptly arrested without probable cause.

As described above, workers at NBC had every reason to believe they would be detained if they "simply refused to answer" the agents' questions—and that is exactly what happened to Argentina and several other employees. After being forced into the breakroom with the rest of the

20

NBC workforce, she was lined up for questioning in front of an armed agent after waiting in the breakroom for approximately half an hour. Over the course of nine seconds, the agent asked Argentina two questions and both times she calmly responded that she wanted to speak to a lawyer. *See* Juarez-Lopez Aff. at 15; *and see* Ex. 13 at 9:52. She did not attempt to flee. The result of her refusal to answer that agent led her to a van where she was shackled and driven off site to a holding facility. Under *Delgado*, the government cannot stretch an administrative workplace warrant into authority for the kind of non-consensual interrogation that occurred here without individualized suspicion.

Prior to her confinement and questioning, agents had zero facts that would give rise to a reasonable suspicion that Argentina herself was unlawfully present in the United States. After her confinement and questioning, agents uncovered no additional information that would have justified her seizure. Indeed, agents had no more reason to suspect Argentina of unlawful presence than any other employee, including the U.S. citizens whom agents had also forced into the breakroom. In sum, law enforcement agents had absolutely no basis to conduct the immediate, aggressive, and universal seizure of every single employee at the factory, including Argentina.

**D.    The Rule 41 warrant to search for documents and information technology does not justify agents' mass seizure of every employee at the NBC factory for purposes of conducting an immigration raid.**

While a Rule 41 warrant provides limited authority for law enforcement to detain some occupants of a premises during a search for contraband, this rule is not absolute. *Michigan v. Summers*, 452 U.S. 692 (1981). As explained in *Bailey v. United States*, these temporary detentions must be limited to people found in the "immediate vicinity" of the area to be searched and the occupants seized must "pose[] a real threat to the safe and efficient execution of a search warrant." 568 U.S. 186, 201 (2013). In determining whether an occupant was lawfully detained within such

"immediate vicinity" of the premises to be searched, courts may consider "the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors." *Cabral v. City of New York*, No. 12 CIV. 4659 LGS, 2014 WL 4636433, at *4 (S.D.N.Y. Sept. 17, 2014).

The government should not be permitted to use the Rule 41 warrant as a pretext to seize Argentina and everyone else in the factory. First, the Rule 41 warrant was overbroad and granted law enforcement authority to search the *entire* NBC property located on an 80-acres of land. *See* Tuck Aff. at Ex. 5 Attachment A. But such an unlimited Attachment A does not satisfy the Fourth Amendment requirement that warrants must be specific and bear a relationship between the area searched and the items sought to be seized as contraband. Here, the warrant authorized a search for evidence related to identity theft and the unlawful use of social security numbers. *See id.* at Attachment B. Sensibly, the Attachment B lists computers, forms, and other HR documents as the type of evidence to seize. At the factory, it is unreasonable to think that those categories of evidence could be found on the production line (where Argentina was working), where NBC stored granola bars, in the cafeteria, in the parking lot, in the grass field that is part of the property or in the bathrooms. But Attachment A is so broad that it gives agents permission to search these locations. Here, the bulk of the employees seized were on the production line and in the main factory. It makes no sense when law enforcement is searching for documents in an office to seize all the employees—including Argentina—who were on the production line and force them inside a breakroom under armed guard while agents search computes and file cabinets in offices.

Notably, it appears that the government understood this limitation when seeking their warrants and should not now be permitted to use the *Bailey* exception to the Fourth Amendment

22

as a *post-hoc* rationalization for the otherwise illegal seizure of all employees at the factory. In

their memorandum of law in support of the *Blackie's* warrant, the government stated the following:

> While the Rule 41 warrant would authorize law enforcement officers to be present at
> the PREMISE and arguably would permit them, while there, to engage in consensual
> conversations with individuals on site and to detain individuals for whom they have or
> develop reasonable suspicion or probable cause of immigration law violations.
> However, it may take longer to speak to all the individuals on site than to seize the
> records, and some illegal alien employees at the PREMISE may not be near the location
> of the records sought to be seized under the Rule 41 warrant, Accordingly, the
> Government seeks a civil administrative warrant out of an abundance of caution and to
> ensure judicial authorization of the planned questioning of employees as described in
> this memorandum and in the application itself.

*See* Ex. 2 at 1—2 n2. In other words, the government recognized that it would not be permitted to

engage in a wholesale seizure of all factory employees using just the Rule 41 warrant. Had they

believed a Rule 41 warrant was sufficient, then it would not have been necessary to get a *Blackie's*

warrant in the first place. Critically, too, the government's argument concedes that employees will

not be "near [(aka "immediate vicinity")] the location of the records sought to be seized under the

Rule 41 warrant." *See id*.  Thus, even the government agrees that the Rule 41 warrant could not

justify going into many areas of the factory, much less seizing every person therein.

Moreover, any attempt to justify even a temporary seizure based on the Rule 41 warrant is

insincere because law enforcement allowed individuals who claimed to be U.S. citizens to leave

the property shortly after gaining entry and *before* any search was conducted.  As body-cam

footage confirms, no actual Rule 41 search was commenced until after agents started allowing U.S.

citizen employees to leave. *See* Ex 11 at 9:50 (citizens being escorted out of the building); *and see*

Ex 9 at 10:15 (agents discussing beginning searching for documents). Nor does it appear that any

search was conducted until all the non-citizens were questioned and arrested. By the agents' own

actions, it is evident that there was no basis to seize employees in relation to conducting the Rule

41 search. Rather, it appears that the original mass-seizure was meant to separate suspected

immigrants and U.S. citizens to facilitate further non-consensual questioning. *See* Ex. 10 at 9:40 (agents discussing how employees were being sorted based on suspected status).

Further, the nature of the Rule 41 search does not implicate the same safety concerns as those in cases where detention incident to a warrant was authorized. It makes sense—based on a theory of officer safety and preventing destruction of evidence or flight upon discovery of contraband—to permit limited detention during a search of a house suspected of having narcotics or guns. Here, however, police went to a family-owned business that makes granola bars. The nature of the criminal charges are non-violent and only involve the use of false identification documents. Law enforcement simply cannot make a straight-faced argument that detention was necessary for "safety."

As such, the government should not be permitted to rely on the Rule 41 warrant to justify Argentina's initial seizure. However, even if the Court were to find the initial seizure was justified, clearly her arrest—that required probable cause—was not.

## II.    Argentina Was Arrested Without a Warrant or Probable Cause.

Neither of the two warrants executed at NBC particularly identified Argentina or authorized her investigatory detention or arrest. Instead, Argentina was detained in the breakroom with every other worker prior to her interrogation based on no individualized, articulable facts. In between the time Argentina was confined in the breakroom and when she was unquestionably under arrest while shackled in a van on the way to the Oswego Border Patrol station, the only consequential factual development is that she politely invoked her right to counsel in response to two questions from an agent. The question is whether Argentina's invocation provided probable cause for agents to escalate her investigative detention into a warrantless arrest. It does not.

24

As *Delgado* makes clear, a person's refusal to answer questions cannot be the basis for an investigative stop, let alone an arrest. 466 U.S. at 216-17. As the Supreme Court has held, a person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer [an officer's questions] does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 498 (1983). And with good reason. If *any* person's mere refusal to answer an officer's questions about their citizenship status or papers provided grounds for arrest, then it would effectively vitiate even citizens' rights to refuse to answer such questions. Particularly given the custodial nature of the questioning (notwithstanding that Argentina was never given a *Miranda* warning), she was well within her rights to decline to answer questions and to ask to speak to a lawyer. If Argentina can be arrested on these facts, then anyone can be.

At least two government documents falsely claim that agents learned at the factory that Argentina is a Guatemalan national and unlawfully present in the United States. The criminal complaint claims that "While on-scene" at the factory, agents were able to ascertain that Argentina was a citizen of Guatemala and unlawfully present. *See* Dkt. No. 1 at 2. And the I-213 also stated that, while at the factory, Argentina "freely admitted to being in the United States illegally" and not possessing "immigration documentation that would allow her to enter or remain in the United States legally." *See* Ex. 7 to Tuck Aff. at 3. The video of Argentina's nine-second interrogation at the factory gives the lie to these accounts. Instead, the video shows that agents asked Argentina what country she was from and if she had "documents" and Argentina responded that she wanted to speak to a lawyer. *See* Juarez-Lopez Aff. at 15; *and see* Ex. 13 at 9:52. Agents received no further information from Argentina or about her before she was led out of the factory, placed in shackles, and driven to a holding facility. It was not until Argentina was in custody in Oswego that she gave officers her name and date to birth, which allowed them to look up her status and develop

25

post-hoc the particularized facts that could have justified her arrest. The Fourth Amendment does not permit such a "shoot first, ask questions later" approach.

**III.    The Court Should Suppress Evidence Discovered after Argentina's Illegal Seizure**

"To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,' [the Supreme Court] has at times required courts to exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234–35 (2016). "[T]he exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable searches and seizures—violations of the Fourth Amendment—primarily through its deterrent effect." *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020). In general, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Moreover, it is well established that fingerprints taken for investigatory purposes must be suppressed in a criminal trial if taken after an illegal seizure. *See Hayes v. Florida*, 470 U.S. 811, 813—15 (1985); *Davis v. Mississippi*, 394 U.S. 721, 727—728 (1969); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1040-41 (1984) ("The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated.")

Here, because this proceeding is criminal, the exclusionary rule requires the suppression of identity evidence obtained because of the Fourth Amendment violations described above. Specifically, that includes all evidence obtained and created after her seizure including: Argentina's fingerprints, a picture taken at the Oswego County Border Patrol Station, the I-213 report regarding her interaction with law enforcement, and her entire immigration A-file.

26

The government will likely contend that the motion should be denied because identity evidence is not suppressible (relying on *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)), and because the lack of deterrent value (relying on this Court's conclusion in *United States v. Morales-Lopez*, 5:25-CR-94, ECF 47 at 7—12 (BKS) (N.D.N.Y. May 5, 2025)).

First, the Second Circuit has explained that, though "*Lopez-Mendoza* reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific pieces of identity-related evidence from suppression." *Pretzantzin v. Holder*, 725 F.3d 161, 166 (2d Cir. 2013). Here, Argentina is not simply challenging the illegality of her arrest or initial seizure (the jurisdictional issue). Rather, she is seeking to suppress specific pieces of tangible evidence that the government would likely attempt to introduce at trial. Because this motion appropriately seeks suppression of evidence obtained for investigative purposes and does not merely challenge the illegality of her arrest, it should not be denied on this basis. *See Morales-Lopez*, ECF 47 at 7—12 (finding that tangible identity evidence is suppressible under the exclusionary rule).

With respect to the issue of deterrence, the *Morales-Lopez* decision set a road map to consider the issues, but it leads to a different destination in this case. In *Morales-Lopez*, this Court found that evidence was collected after a constitutional violation but concluded that suppression was not the right remedy because it would fail to yield appreciable deterrence. *Id.* at 11—12. Specifically, the Court reasoned that, because the defendant "could 'simply be reindicted for the same offense, suppressing his identity would have little deterrent effect' upon the agents who seized him." *Id*. at 11 (citations omitted).

The present case is different than *Morales-Lopez* in several important aspects that compel a different result. First, in *Morales-Lopez*, this Court relied on *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005), in reaching its conclusion that suppression would not have a

27

deterrent effect. But *Navarro-Diaz* favors the opposite result here. The *Navarro-Diaz* court expressly recognized the distinction between its own facts and cases like this one and that there may be situations where suppression is compelled based on the nature of the constitutional violation. *See* 420 F.3d at 587. Specifically, the Sixth Circuit posited that where there are "widespread detentions and questioning of suspected aliens" that the Fourth Amendment violation may be "egregious" and "'transgress on notions of fundamental fairness,'" requiring suppression. *See id*. (citing *Lopez-Mendoza*, 468 U.S. at 1050). Undoubtedly, what took place here involved the mass seizure of the entire NBC workforce, including U.S. citizens; large-scale forced questioning without individualized suspicion to ferret out criminal and civil violations of the immigration laws; and arrests based only on individuals' refusal to answer questions. Although the defendants in *Navarro-Diaz* and *Lopez-Mendoza* were not themselves the victims of egregious Fourth Amendment violations, the courts in both of those cases recognize that where, as here, the scope and scale of the constitutional violations at issue are different in kind, exclusion and its concomitant deterrence to future misconduct is warranted. *Navarro-Diaz*, 420 F.3d at 587—88.

This Court's *Morales-Lopez* decision also cited *United States v. Ortiz-Hernandez*, 427 F.3d 567, 579 (9th Cir. 2005), in support of its conclusion that suppression was not warranted. However, *Ortiz-Hernandez* dealt with a case where the appellate court *affirmed* the district court's ruling to suppress the defendant's initial set of fingerprints based on an arrest without probable cause. *See id.* at 576. That court's discussion about the possibility that the defendant could be re-charged for a new crime dealt with whether the court could compel the defendant to provide a second set of fingerprints—a situation that is not present here. *See id*.

At its core, the *Morales-Lopez* decision relied on the argument that, based on the continuing nature of the illegal reentry crime, Argentina could be reindicted upon release on the current

28

charge. However, that argument was made, and explicitly rejected, in a recent decision in this district involving an illegal reentry charge. *See United States v. Martinez-Rodriguez*, -- F. Supp. 3d --, No. 1:25-CR-00200 (AMN), 2025 WL 2355630, at *8 (N.D.N.Y. July 23, 2025). Considering deterrence, Judge Nardacci stated that she "does not understand the relevant deterrence considerations to rise and fall on the prosecution of a single criminal defendant." *See id*. at *9. Judge Nardacci also considered the minimal "social costs" associated with suppression in this case and reasoned that "if a prosecution could successfully continue even after evidence is suppressed, that would eliminate 'the serious cost of 'letting guilty and possibly dangerous defendants go free.'" *Id*. (citations omitted). That conclusion was relevant because "less deterrent benefit is needed to 'appreciably outweigh the costs of suppression,' when such costs are reduced or absent." *Id*. (citation omitted). Finally, and most significantly, the Court found that the general deterrent effect of suppression is substantial when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights. *See id*.

Here, the constitutional violations are the result of deliberate, reckless or grossly negligent behavior. Moreover, recent history has demonstrated that immigration enforcement systematically fails to follow well-established constitutional law—especially with respect to unreasonable seizures of people. *See, e.g.*, *Morales-Lopez*, ECF 47 at 9—10 (finding ICE/ERO and HSI agents committed deliberate, reckless or grossly negligent constitutional violations); *Martinez-Rodriguez*, 2025 WL 2355630, at *8 (same and the same agencies involved). Critically, many of the same agents who participated in Morales-Lopez's arrest were involved in the Cato raid. *Compare Morales-Lopez*, ECF 23-3 at 9 (stating E. Lorenzo was the person who interviewed Morales-Lopez); with Ex. 7 to Tuck Aff at 2 (listing E. Lorenzo as one of the "arresting agent[s]"); *and*

29

compare *Morales-Lopez*, ECF 23-3 at 12 and 14 (*Miranda* waiver and I-213 signed by F. Rubenstein); with *Juarez-Lopez*, ECF 1, Criminal Complaint (signed by F. Rubenstein).

The NBC raid is a prime example of systematic gross negligence in law enforcement's respect of constitutional rights given the massive and immediate seizure of more than 50 people followed by warrantless arrests of individuals who simply refused to answer questions. Moreover, the social costs of suppression here are negligible given the likely guideline range in this case (0-6 months), that Argentina is subject to an immigration detainer (*see* Ex. 8 to Tuck Aff.), that she was arrested while she was working, and that she has no criminal history (*see* Juarez-Lopez Aff. at 29). As such, the appropriate remedy to address the various constitutional violations in this case is the suppression of specific pieces of evidence discovered after Argentina's illegal seizure.

Finally, if the Court declines suppression of the evidence here, it could lead to the unimaginable result that law enforcement officers are effectively immune from obeying the constitution when making immigration related arrests. Any officer could simply see a Latino-looking person or someone who has an accent and arrest that person under suspicion that they are an illegal immigrant. After, they may take the fingerprints of this person to discover his or her name, and thereby learn his or her status and whether he or she has committed a crime. If the person is here illegally after an earlier deportation, they would be subject to indictment on a reentry charge. But that person could essentially never challenge the evidence necessary to obtain a conviction that was collected after an illegal arrest. The Constitution does not have a carve-out for illegal reentry offenses.

## CONCLUSION

For the foregoing reasons, the Court should suppress evidence collected after Argentina's illegal seizure and dismiss this case.

30

Dated:        November 10, 2025              Respectfully submitted,


By:    */s/ Paul Tuck*
       Paul Tuck, Esq.
       Bar Roll No. 520814

       Paul Tuck Attorney at Law PLLC
       P.O. Box 44
       Manlius, New York 13104
       315.314.4545
       Paul@paultucklaw.com
       www.paultucklaw.com


cc:    Michael Perry, AUSA (via ECF)
       Michael Whalen, AUSA (via ECF)
       Argentina Juarez-Lopez (via mail)

31