# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF NEW YORK

## DECLARATION OF ANDREW McCOY

I, Andrew McCoy, declare under penalty of perjury that the following is true and correct:

1. I am a Special Agent with Homeland Security Investigations (HSI) and have been since December 2008. HSI is part of the Department of Homeland Security, along with U.S. Border Patrol and Immigrations and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) and other agencies and departments.

2. I took a lead role in planning the September 4, 2025 search at the Nutrition Bar Confectioners factory in Cato, New York, and I was on scene throughout the search that day. Agents and officers from HSI, Border Patrol, ICE ERO, and IRS Criminal Investigation (IRS-CI) were among the federal officers who participated in the search. We received logistical support from other federal and local law enforcement agencies as well, including for purposes of site security, transport, and communication.

3. I have participated in dozens of search warrants brought under Rule 41 of the Federal Rules of Criminal Procedure during my career in law enforcement, including searches of private homes and of businesses, and I have received significant training on how to safely execute search warrants. This training has included how to keep everyone on scene safe, to including officers, subjects, and bystanders, and how to prevent evidence from being altered, hidden, or destroyed during searches.

4. I have participated in over 100 residential and commercial search warrants, and every time officers have worn clearly marked ballistic vests and have worn agency-issued firearms for safety.

5.  I know from my training and experience that it is a basic safety measure during the search of a building to secure the location quickly after entry. This includes identifying ourselves as law enforcement officers, finding all individuals present, and making sure these individuals do not impede the search, typically by escorting them to a designated location or locations within the building and thereafter monitoring them during the search. It also involves entering all rooms and opening all doors, which aids the search by preventing evidence destruction and helps keep officers safe from individuals who might be hiding or intending to resist or attack officers during the search. Officers then maintain control of a premises during a search for these same reasons.

6.  I organized logistical and safety meetings in advance of the September 4, 2025 search. During these meetings, officer safety was frequently discussed. Based on the size of the facility and the information we had learned and believed about the operation of the business, we anticipated that not more than approximately 50-60 employees would be on shift during the execution of the warrant. We planned the search accordingly, and approximately 60 agents and officers joined the September 4, 2025 search.

7.  HSI and ERO agents wear agency issued body cameras during search warrant executions in this District. I know and have learned that Border Patrol and IRS-CI do not have or wear body cameras in this District. I collected the body camera footage after the search, and it was not compiled or made available to Border Patrol until well after September 8, 2025, when criminal complaints were filed.

8.  I was informed soon after we entered the facility that approximately 160 employees were on shift at the Nutrition Bar factory the morning of the search. I was surprised by this number, as were others who helped plan the search.

9. We encountered the head of human resources for Nutrition Bar Confectioners outside the facility at the outset of the execution of the search warrant near the front door. He unlocked the front door. Upon request, he made an announcement in English over a public address system in the facility explaining to workers that a law enforcement search warrant was underway and directing workers to assemble in the production hallway area. He also instructed employees to safely turn off all equipment. This announcement was made approximately three minutes after entry. One of the ERO officers present then made a similar announcement over the same public address system in Spanish because we understood and anticipated, based on the pre-search investigation, that many of the workers were likely native Spanish speakers.

10. Part of securing a search location involves clearing or making entry into each room, including closets and bathrooms. This is important to help locate all individuals present, to identify locations where evidence might be located, to preserve evidence, and for officer safety reasons.

11. During the search, I learned from a female employee of Nutrition Bar that there were people in a bathroom. This was approximately three minutes after the announcement to assemble in the production hallway. As reflected on body camera footage, officers repeatedly knocked on the bathroom door, identified themselves as law enforcement, and instructed (in English and Spanish) the occupant(s) to open the door. It became clear in attempting to open the door that one or more people were pushing back against it to prevent it from opening. Eventually, I was able to push against the door with my shoulder with enough force to open it. Upon entering the bathroom, I encountered two adult women, who apparently had been sitting, standing, or otherwise pushing against the door in an attempt to prevent us from entering. Another woman was in one of the bathroom stalls. She was instructed in both English and Spanish to come out and was given a reasonable amount of time to do so. The woman who emerged from the stall was

3

subsequently permitted to wash her hands. I did not see anybody kick open her bathroom stall either in person or on any of the body camera footage captured that day. It is my understanding that all three women from that bathroom were escorted by a female agent to the area where other employees had been instructed to gather and that they were not struck, handcuffed, or retaliated against for having disobeyed initial instructions to open the door and come out of the bathroom.

12. On August 28, 2025, I applied for and received two warrants, which United States Magistrate Judge Thérèse Wiley Dancks signed. One was a Rule 41 search warrant, and the other was an administrative warrant.

13. In my training and experience, safety – of everyone on scene, including officers – is a paramount concern when executing a search warrant. During operational briefings before search warrants are executed, the priority of safety is mentioned multiple times. Every warrant that I have participated in involved securing the scene and asking questions of individuals present. As a standard practice in all the search warrants I have participated in, individuals are also asked to produce identification, which helps law enforcement identity witnesses, potential targets, and individuals who may be wanted for questioning by law enforcement or who may be the subject of arrest warrants.

14. In my training and experience, it would have been important and necessary to secure the entire Nutrition Bar facility and locate all employees even if an administrative warrant had not been sought or obtained. Clearing each room and gathering the employees to a central location were essential aspects of safely and efficiently executing the Rule 41 warrant.

15. In advance of the search, I anticipated from what I knew about the Nutrition Bar facility that much of the evidence sought through the Rule 41 warrant would be located in one or more offices toward the front of the facility. However, the search team did search – and even in

the absence of an administrative search warrant would have searched – the entire facility to ensure that we identified all locations where electronic or physical evidence relevant to the warrant could be stored.

16. During the Nutrition Bar warrant, some records relevant to the Rule 41 warrant were located in and seized from an upstairs storage room not near the front offices, so the records were not all in one central location.

17. When officers and agents made entry into Nutrition Bar, they encountered many workers in a food production area. This area had very loud machinery with moving parts, some of which appeared dangerous and involved hot liquid. It would not have been safe or feasible for such workers to continue operating the machinery and moving around as needed to run these production lines during the search. The presence of agents and officers not dressed or trained to be on food production lines could also have compromised the safety and integrity of the food being produced. Accordingly, this area was cleared pursuant to standard search protocols.

Executed on 11/25/25
Syracuse, New York

By: Andrew McCoy
Andrew McCoy