**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

ARGENTINA JUAREZ-LOPEZ,

Defendant

Case 5:25-CR-424 (BKS)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF ARGENTINA JUAREZ-LOPEZ'S MOTION TO SUPPRESS EVIDENCE**

i

## TABLE OF CONTENTS

I.    The Government Either Concedes or Does Not Dispute Any Material Fact. ...................... 1

II.    The Government Admits that Argentina and Every Other Member of the NBC Workforce Present on September 4 Was Seized En Masse. .......................................................... 3

    A.    Neither warrant authorized any seizure of persons. ........................................................ 3

    B.    The Government cannot claim seizure authority incident to the Rule 41 search warrant as the basis for mass custodial questioning about citizenship status. .................................... 4

    C.    Argentina's initial interaction with law enforcement raiding the factory did not provide a basis to seize her. .................................................................................................... 5

III.    The Government's Opposition Underscores the Constitutional Infirmity of *Blackie's* Warrants Generally and This *Blackie's* Warrant in Particular .................................................... 6

IV.    Argentina Was Arrested Without Probable Cause. ......................................................... 8

V.    Suppression Is the Only Appropriate Remedy Here. ....................................................... 12

    A.    This is an egregious case and suppression is warranted to deter future abuse. ............. 12

    B.    The Court should suppress the evidence in this case. ................................................... 14

# TABLE OF AUTHORITIES

## CASES

*Bailey v. United States*, 568 U.S. 186 (2013) ................................................................. 4

*Brown v. City of Oneonta*, 221 F.3d 329 (2d Cir. 2000)................................................... 4

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty,* 542 U.S. 177 (2004) ............. 9, 10

*In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025) ................... 7, 8

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547 (9th Cir. 1986) .. 10

Martinez v. Nygaard, 831 F.2d 822 (9th Cir. 1987) ...................................................... 12

*Michigan v. Summers*, 452 U.S. 692 (1981) ................................................................. 5

*Muehler v. Mena*, 544 U.S. 93 (2005) ....................................................................... 4

*Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019) ........................................... 5, 7, 8, 13

*Pretzantzin v. Holder,* 725 F.3d 161 (2d Cir. 2013) ...................................................... 15

*United States v. Adegbite*, 846 F.2d 834 (2d Cir. 1988) ................................................. 14

*United States v. Colon*, 250 F.3d 130 (2d Cir. 2001)...................................................... 6

*United States v. Martinez-Rodriguez,* -- F. Supp. 3d --, No. 1:25-CR-00200 (AMN), 2025 WL 2355630 (N.D.N.Y. July 23, 2025)................................................................. 15

*United States v. Mendez-Lopez*, 528 F. Supp. 972 (N.D. Okla. 1981) ................................ 11

*United States v. Morales-Lopez*, 5:25-CR-94 (BKS), Dkt. No. 47 (N.D.N.Y. May 5, 2025) ...... 15

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ...................................................................... 7

## STATUTES

8 U.S.C. § 1304(e) ...................................................................................... 11, 12

8 U.S.C. § 1357(a)(2)..................................................................................... 8, 12

## OTHER AUTHORITIES

Homeland Security Investigations, Search and Seizure Handbook, HSI HB 12-04, Sept. 14, 2012 ....................................................................................................... 7

## I.     The Government Either Concedes or Does Not Dispute Any Material Fact.

The Opposition and its supporting affidavits show that the government does not meaningfully dispute the following material facts asserted in the motion to suppress.

(1)     Law enforcement seized and detained every employee at Nutrition Bar Confectioners ("NBC" or the "facility") within seconds of entering the facility and forced everyone to the cafeteria for questioning about their citizenship. *See* Dkt. No. 33-6 at ¶ 9 (stating an announcement was made to go to the cafeteria); ¶ 14 ("gathering employees to a central location were essential aspects of safely and efficiently executing the Rule 41 warrant"); Dkt. No. 33 at 15 fn. 10 ("officers initially and briefly seized *all* employees" for "question[ing] to ascertain which of those employees might be present unlawfully") (emphasis original)).

(2)     The raid involved at least 60 agents from at least four federal agencies. Dkt. No. 33-6 at ¶¶ 2, 6. Agents displayed weapons and body armor. Dkt. No. 33-6 at ¶ 4. Agents shut down production and swept the facility, including forcibly entering the women's bathroom and stalls, to ensure that every NBC worker was in the cafeteria. Dkt. No. 33-6 at ¶¶9-11.

(3)     After employees were in the cafeteria, people who identified as U.S. citizens were permitted to leave the facility while individuals who did not respond to a general question about citizenship were detained further to investigate criminal violations. *See* Dkt. No. 33 at 15 fn. 10 (admitting that citizens were allowed to leave and claiming that officers have a right to "choose not to seize people (or things) they would otherwise be authorized to seize" and that they "focus[ed] their questioning on non-citizens suspected of immigration violations").

(4)     Employees who remained detained in the cafeteria were not permitted to leave and were divided into groups, and required to engage in one-on-one questioning with an armed agent while several armed agents stood guard. *See* Dkt. No. 33 at 19 (acknowledging that employees were not free to leave the breakroom and were forced to engage in "individual interviews").

Although the government asserts that "the employees were free to leave their interviews with agents or simply refuse to answer questions," Dkt. No. 33 at 19, in addition to the bodycam footage that speaks for itself, *see* Dkt. 23-1 at 7-8, this claim is also directly contradicted by the admission *in the following paragraph* that Argentina's refusal to answer questions about her citizenship, nationality, and immigration documents was the basis for her arrest. Dkt. No. 33 at 19.

(5)    Argentina's only exchange with agents in the cafeteria involved her asking for an attorney in response to questions about where she was from and if she had "documents." *See* Dkt. No. 33 at 6 (restating facts in Argentina's affidavit and "agree[ing]" that she "referenced an attorney").

(6)    Agents arrested Argentina immediately after her seconds-long interview and transported her to the Oswego Border Patrol Station (the "Station") before they knew her name, country of origin, immigration status or any affirmative information about her whatsoever. *See* Dkt. No. 33 at 20 (explaining the basis for her arrest).

(7)    Agents made misrepresentations of fact in an I-213 report that were later relied upon to establish the basis for a criminal complaint. *See* Dkt. No. 33 at 24 fn. 17; 25 fn. 19; Dkt. No. 33-9.

To be sure, the government quibbles with the characterization of certain evidence, but these points are semantic rather than substantive and do not impact Argentina's credibility. For example, the government contends that "soft-restraints" were used to transport detainees to the Station and disputes that Argentina was "handcuffed." *See* Dkt. No. 33 at 24 fn. 18; Dkt. No. 33-8. Even accepting that contention, this is a distinction without a difference. Argentina was indisputably arrested prior to going to the transport. Further, the government nitpicks that Argentina and her colleagues were not "pushed" into the corner of the cafeteria but directed to form a "relatively

ordered line." *See* Dkt. No. 33 at 6, 19, 24 fn. 18. The bodycam footage shows employees in the corner of the cafeteria forced to engage in one-on-one conversations with an armed agent. *See* Dkt. No. 23-2, Ex. 10 at 9:40-9:44. The material facts have been established without a hearing and Argentina agrees that the Court can decide this motion on the record.

## II.     The Government Admits that Argentina and Every Other Member of the NBC Workforce Present on September 4 Was Seized En Masse.

Agents seized the entire workforce for custodial questioning immediately upon entering the factory before asking a single question or developing reasonable suspicion of anyone, including Argentina. *See* Dkt. No. 33 at 15, n. 10.[1] This admits a Fourth Amendment violation absent a valid exception to the prohibition against suspicionless seizures. There was none.

### A.  Neither warrant authorized any seizure of persons.

Neither warrant provided a legal basis for a blanket seizure or for custodial questioning of individuals. *See* Dkt. No 33-1 (Rule 41); 33-4 (*Blackie's*). The Rule 41 warrant identified only seven people, "for whom law enforcement has reasonable suspicion to approach and detain in the context of a *Terry* stop . . . ." Dkt. No. 33-1 at ¶ 34. Argentina's name was not one of those seven. Likewise, the administrative warrant did not authorize the seizure of people, but rather permitted "systemic consensual" encounters. Dkt. No. 33-3 at 6. As such, agents lacked authority to seize the entire workforce pursuant to either warrant application.

---

[1] The government's admission that the entire workforce was seized immediately upon entry for questioning about citizenship, Dkt. No. 33 at 15 fn.10, makes superfluous the multi-factor inquiry into whether the agents' conduct would have made a reasonable person feel free to terminate the encounter. *See* Dkt. No. 23-1 at 12-13 (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000)). In any event, it is undisputed that scores of agents displaying weapons and body armor shut down production at the factory; ordered the workforce into the cafeteria; and conducted secondary sweeps—including forcibly entering the women's bathroom and stalls—to ensure that every NBC worker was in the cafeteria for questioning about their citizenship. *See* Dkt. 23-1 at 4-10; Dkt. No. 33-6 at ¶¶ 2, 4, 6, 9-11.

**B. The Government cannot claim seizure authority incident to the Rule 41 search warrant as the basis for mass custodial questioning about citizenship status.**

The government now claims it had authority to seize and question Argentina and the rest of the NBC workforce incident to execution of the Rule 41 search warrant. Dkt. No. 33 at 15-16 & n.10 (citing primarily *Bailey v. United States*, 568 U.S. 186 (2013); and *Muehler v. Mena*, 544 U.S. 93 (2005)). But this is by no means a standard situation where *Bailey* or *Mena* gives the government unrestricted authority.[2] Rather, as the Ninth Circuit held under analogous facts in *Perez Cruz v. Barr*, 926 F.3d 1128 (9th Cir. 2019), the government cannot rely on the Rule 41 warrant as a basis to seize every employee for questioning without particularization.

*Perez Cruz* held that ICE agents violated the Fourth Amendment when they "implemented a preconceived plan to 'target' over 200 factory workers for detention and for interrogation as to their immigration status" by "obtaining and executing a [criminal] search warrant for employment records at the factory." *Id.* at 1133-34, 1146. Accepting the validity of the criminal search warrant itself, the Ninth Circuit held that "[t]he *Summers* line of cases does not justify using the execution of a search warrant for documents to 'target' for detention, interrogation, and arrest busloads of people who could not otherwise be detained." *Perez Cruz*, 926 F.3d at 1146. "*Mena* authorizes officers to ask questions of *Summers* detainees as long as the detention is not 'prolonged by the questioning,' [b]ut that authorization does not allow officers to conduct a *Summers* detention *for the purpose* of obtaining answers from detainees . . . ." *Id*. at 1144 (citation omitted).

---

[2] The government states the seizure of the NBC workforce was for "officer safety, evidence preservation, and efficiency," Dkt No. 33 at 15-16, but unlike the circumstances in *Mena*, which moved the Court to write, "[t]his was no ordinary search," 544 U.S. at 100, the Rule 41 warrant contemplated an entirely ordinary search for HR documents and IT equipment. The warrant applications express no concerns about weapons and armed gang members as in *Mena*, or ephemeral contraband like the drugs in *Michigan v. Summers*, 452 U.S. 692, 694 (1981).

Here, as in *Perez-Cruz*, the government's reliance on the Rule 41 search warrant for authority to question the entire NBC workforce about their immigration status is pretextual. The warrant execution was planned and involved at least 60 agents from at least four federal agencies, including a substantial number from ICE/ERO and Border Patrol (who had no relationship with the Rule 41 warrant). Dkt. No. 33-6 at ¶¶ 2, 6. Agents arrived with personnel restraints and vans for transporting detainees. Dkt. No. 33-8 at ¶¶ 3-4. The most obvious admission that the government intended to use the Rule 41 warrant as pretext to detain and question people about their immigration status and make arrests at NBC was their recognition that the *Blackie's* warrant did not authorize the nature of the seizure and non-consensual questioning of the workforce planned for September 4, 2025. Dkt. No. 33-3 at 6; 33-6 at ¶¶ 13-14. In other words, the government lacked the particularized factual basis required for a Rule 41 warrant to search for or seize individuals, and the kind of non-consensual questioning they sought to do exceeded the scope of the *Blackie's* warrant. The Court should not permit this kind of shell game.

### C. Argentina's initial interaction with law enforcement raiding the factory did not provide a basis to seize her.

Argentina's purported disobedience of an officer's command did not justify her seizure. First, the government admits that the entire workforce was seized upon entry to the factory—*i.e.*, prior to Argentina hearing the first agent say "stop." Dkt. No. 33 at 15, n.10. Second, Argentina did not disobey law enforcement. The government claims that a police officer "ordered [Argentina] to 'Stop,'" and that Argentina "disobeyed that instruction, despite understanding it and knowing that the person who gave the order was a 'police' officer." *Id*. at 17. But that is not what her affidavit stated. Her affidavit explains that when she heard an agent say "stop," she stopped heading in the direction she was going, walked towards another part of the factory, and promptly obeyed a second officer's gestural commands to head to the cafeteria. Dkt. No. 23-16 (Juarez-

Lopez Aff.) ¶¶ 6-8.[3] And third, even if Argentina's change of direction could be interpreted as "nervous, evasive, and disobedient," Dkt. No. 33 at 18, the "imputed knowledge" doctrine does not apply. Here, the government does not and cannot assert that the "officer[] initiating the [stop]" (who the government has not identified) conveyed "information that would provide reasonable suspicion or probable cause" to the officer who subsequently detained and arrested Argentina. *United States v. Colon*, 250 F.3d 130, 135–36 (2d Cir. 2001). That 1 out of 60 agents might have "turned out, after the fact, to have additional information which would have given the [seizing] officers reasonable suspicion cannot retroactively make their actions objectively reasonable." *Id.*

### III.    The Government's Opposition Underscores the Constitutional Infirmity of *Blackie's* Warrants Generally and This *Blackie's* Warrant in Particular.

The government's reliance on *Blackie's* to justify this raid and the administrative warrant they obtained reinforces why such warrants are unconstitutional. The Fourth Amendment draws a clear line: "[A] search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). This requirement "cannot be undercut or avoided by simply pointing to the fact that . . . there exists probable cause to search . . . the premises where the person may happen to be." *Id.*; *accord Perez Cruz*, 926 F.3d at 1138 ("That ICE suspected MSE was employing undocumented workers did not provide reasonable suspicion that Perez Cruz himself was undocumented."). The administrative warrant the government relies on flouts these constitutional principles by authorizing entry into a workplace specifically to search for and interrogate workers under inherently coercive conditions

---

[3] The government did not provide any evidence of its alternative view of Argentina's interaction with police and did not provide a single affidavit of an agent with any recollection of how Argentina was originally seized and how she responded. Thus, the facts as stated in the affidavit control, not the government's mischaracterization.

for the purpose arresting them for deportation and/or charging them with crimes without naming or describing a single individual to be seized.

The government does not meaningfully address this foundational defect. Tellingly, it avoids grappling with Magistrate Judge Edison's on-point decision rejecting the constitutional viability of *Blackie's* warrants in *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025).[4] Instead, it notes that the ruling is "not binding," but that is no answer to the decision's reasoning which flows directly from binding authority.

In discussing Magistrate Judge Edison's opinion, the government demonstrates its misunderstanding of the admonition that "[p]erhaps the Government thinks that, with an administrative warrant, it can get around the particularity requirements of a Rule 41 warrant. It cannot." Dkt. No. 33 at 12 (quoting 784 F. Supp. 3d. at 975). In recognizing that "an alien is a person," *id.* at 972, and that "people are not documents or safety hazards," *id.* at 975 Magistrate Judge Edison was not advising the government to get a Rule 41 search warrant to conduct the kind of pretextual operation rejected in *Perez Cruz*. Rather, the point is that searching for and seizing a person agents hope to arrest (or to use as evidence of a crime) requires a Rule 41 warrant.

When a person is the evidence or the subject to be seized, Rule 41 presupposes what the Fourth Amendment demands: a warrant directed at that person, supported by individualized

---

[4] Among Judge Edison's well-reasoned points, the government does not address his critique that *Blackie'*s central premise for authorizing an administrative warrant in these circumstances was superseded by the 1986 statute criminalizing the employment of unauthorized workers. Dkt. No. 23-1 at 15 (citing *In re Sealed Search Warrant Application*, 784 F. Supp. 3d at 973). Perhaps recognizing *Blackie's* precarious constitutional footing, Homeland Security Investigations' own Search and Seizure Handbook advises that administrative search warrants should only be used "where consent is not an option and *no criminal prosecution is contemplated*." Homeland Security Investigations, Search and Seizure Handbook at 36, HSI HB 12-04, Sept. 14, 2012, https://www.ice.gov/doclib/foia/policy/hsi12-04_SearchSeizure_09.14.2012.pdf    (emphasis added) (also stating "[a]n administrative warrant may not be used, however, as a pretext to gather evidence for a criminal prosecution").

probable cause. Yet neither the administrative warrant nor the Rule 41 warrant here named or described Argentina, or any defined class of workers to be seized. [5]

The government's suggestion that it could not feasibly obtain person-specific process only underscores the problem. If, for example, a Rule 41 search of NBC's HR files yielded records giving probable cause to believe particular, identified employees were violating immigration or document-fraud laws, the government could seek arrest warrants for those individuals, or in appropriate circumstances, rely on the limited warrantless-arrest authority Congress provided in 8 U.S.C. § 1357(a)(2). Following a more deliberate approach may conflict with this administration's efforts to arrest and deport as many immigrants as possible as quickly as possible without regard to procedural niceties, but it is no less than what the Constitution requires.

This raid shows that detentive interrogations are an inescapable consequence of using an administrative search warrant for people whom the government intends to investigate as criminal suspects and/or deportation targets. Sixty armed agents entered with restraints and lined up an entire workforce for questioning, where workers' answers—or silence—could (and did) result in an arrest. What occurred was a person-focused raid, to arrest people, absent a person-focused warrant—exactly what the Fourth Amendment does not permit.

## IV.    Argentina Was Arrested Without Probable Cause.

---

[5] The government states that Argentina does not challenge the validity of the Rule 41 search warrant, Dkt. No. 33 at 12-13, which is true only insofar as the warrant authorizes the search for HR documents and IT equipment at NBC. Both in her opening brief and above, Argentina challenges the validity of the government's claim that the Rule 41 warrant authorized the search for or seizure of persons. *See* Dkt. No. 23-1 at 21-24; *supra* § II. Argentina also challenged that the warrant was overbroad. *See id.* at 22.

According to the government, the facts that supported Argentina's arrest were the following: (1) the defendant invoked her right to counsel in response to a request to produce her immigration documents; (2) the defendant had disobeyed a direct command of an officer to "stop" and had walked away from that officer, and (3) the defendant did not avail herself of opportunities to identify herself as a citizen or legally authorized worker. *See* Dkt. No. 33 at 20. This is not probable cause.

First, failing to affirmatively respond to a general question to dozens of people to come forward if you are a citizen is not an admission of being an illegal alien. Her silence in this context is meaningless. To support the inference that Argentina "de facto self-identified as present illegally in some manner" by merely not affirmatively claiming to be a U.S. citizen, the government cites *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty,* 542 U.S. 177, 180, 190-91 (2004). Dkt. No. 33 at 19. *Hiibel* involved a Nevada law requiring a person to identify themselves when asked for ID during an investigatory stop and whether that requirement violated the Fifth Amendment. *See id. Hiibel* held there was no violation because providing one's name would not "be used to incriminate him," or "furnish a link in the chain of evidence needed to prosecute him." *Id.* at 190 (citation omitted). Here, it was just the opposite. The general question requiring self-identification of citizenship status was seeking testimonial evidence (one's citizenship status), it could be incriminating (as agents were there indisputably to perform an immigration raid and were allowing citizens to leave), and it was compelled (as employees were asked this question after they were seized). Critically, agents wanted citizenship status to "furnish a link in the chain of evidence" to prosecute immigration crimes. This is the very kind of testimonial questioning where the Fifth Amendment protects silence.

Relatedly, Argentina's decision to invoke her right to counsel cannot be relied upon as probable cause to arrest. At best, Argentina's interrogation was part of a "consensual" factory survey pursuant to a *Blackie's* warrant as contemplated in *Delgado* where a refusal to answer would not produce a consequence. *See Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 553 (9th Cir. 1986) ("Where a worker merely 'refuses to answer,' but does not attempt 'to flee or evade the agents,' any 'additional steps' taken by the agents must be supported by 'some minimal level of objective justification to validate the detention or seizure.'") (quoting *INS v. Delgado*, 466 U.S. 210, 216-217, 218, 220)). At worst, it was a custodial interrogation without *Miranda* and without reasonable suspicion where she unequivocally invoked her right to counsel. *See Hiibel,* 542 U.S. at 190-91. Under either circumstance, Argentina did not have to answer those questions and she cannot be arrested based solely on her refusal.

Additionally, Argentina's initial reaction to a massive law enforcement raid on her workplace cannot be held against her. As stated above, Argentina complied with an agent's gestural commands to go in a particular direction. And, in any event, the agent who decided to arrest Argentina did not know anything about Argentina's original interaction so that cannot be imputed to the arresting officer.

Even accepting the government is entitled to rely on each of these facts, taken together they fail to provide a basis to arrest. The government apparently claims probable cause to arrest for a violation of 8 U.S.C. § 1304(e). According to the government, "[a]s a non-citizen, the defendant was legally required to "at all times carry with [her] and have in [her] personal possession any certificate of alien registration or alien registration receipt card issued to [her] . . . ." Dkt. No. 33 at 20 (citing 8 U.S.C. § 1304(e)). But 1304(e) is not that broad and instead applies only to an alien who has had a certificate of alien registration "issued to him." 8 U.S.C. § 1304(e). In other words,

a required element of this crime is that the alien was first registered. *See United States v. Mendez-Lopez*, 528 F. Supp. 972 (N.D. Okla. 1981) (dismissing an information where the government lacked proof that the defendant had ever had a certificate of alien registration "issued to him"). To establish sufficient evidence to make an arrest for 8 U.S.C. § 1304(e), officers could rely on an admission as to country of origin or the circumstances of the person's arrival to the United States; a check of HSI databases; or some actual information related to the person themself. None of that information was known to agents at the time of Argentina's arrest.

Rather, the only conceivable biographical fact of consequence that the government claims they knew prior to Argentina's arrest was that she did not respond to a general question about whether she was a citizen. Argentina could not have been arrested for failure to possess "any" registration documentation "issued to [her]" when officers lacked any knowledge of who she was, where she was from, how she initially entered the United States, and whether she was originally processed. To hold otherwise would open the door to limitless arrests—not just temporary seizures—of any individuals (including U.S. citizens) who simply fail to self-identify as citizens and are present in a place where officers expect to encounter aliens.[6]

Additionally, as a matter of statute, a warrantless arrest for a violation of immigration laws must also be based upon a reasonable belief that the arrestee "is likely to escape before a warrant

---

[6] The case the government cites confirms this point. In *Martinez v. Nygaard,* the plaintiff encountered agents during a workplace enforcement operation where she admitted to being a permanent resident alien and that she had her papers at "home." 831 F.2d 822, 825 (9th Cir. 1987). The court held that this was "probable cause to believe [the plaintiff] had violated the 'green card' statute as she did not have her papers on her person." *Id.* at 828. In that case, the individual *admitted* to being an alien *and* to not having her papers—the main components of a violation of 8 U.S.C. § 1304(e). Here, law enforcement had no admission that Argentina was an alien and no information related to what documents she did or did not possess.

can be obtained for his arrest. . . ." 8 U.S.C. § 1357(a)(2). Here, the government does not contend that agents formed such a belief and they could not have given they knew nothing about Argentina.

Law enforcement did not care about whom they encountered during the raid on September 4, 2025. They detained with impunity any person they suspected—with or without any basis—of being a deportable immigrant. It does not matter whether agents were proven right at the Station— although reports show that they have been wrong, and with real human consequences.[7] Regardless, the Constitution does not reward hindsight. The Constitution requires diligent and faithful compliance and there is no clearer example of law enforcement overreach than this raid.

## V.    Suppression Is the Only Appropriate Remedy Here.

### A.    This is an egregious case and suppression is warranted to deter future abuse.

The execution of the NBC raid—and the government's post-hoc attempts to justify it— demonstrate that the government either misled Judge Dancks or deliberately exceeded the scope of the warrants they applied for and received. As discussed in Section I, *supra*, the government applied to Judge Dancks for a Rule 41 search warrant for documents, not for authority to seize any person. *See* Dkt. No. 33-1 at 1 (no X in the box for "a person to be arrested or a person who is unlawfully restrained"). As such, the government could not use the Rule 41 warrant as a pretextual basis for the mass custodial interrogation and arrest of as many immigrants as possible, which was the unmistakable purpose of this large-scale, pre-planned operation. *See Perez Cruz*, 926 F.3d at 1146. And, even if the constitutionally dubious *Blackie's* warrant authorized entry and consensual questioning of employees, it did not authorize the immediate seizure of all employees for non-

---

[7] *See,e.g. Miriam Jordan*, *She Was Deported in Error. Her Child Was Left Behind.*, N.Y. Times, Nov. 14, 2025, https://www.nytimes.com/2025/11/14/us/trump-deportations-families.html ("Ms. Lopez has been separated from her children since early September, when federal agents raided the nutrition-bar factory where she worked in Central New York. Ms. Lopez was detained and deported to Guatemala, leaving behind her 2 year-old son. . . . The government returned Ms. Lopez to the United States late on Thursday because of the mistake.").

consensual questioning. Neither application gave any indication of the kind of overwhelming force agents would use in executing the warrants or any security threats or ephemeral evidence that might require such coercive tactics. The government did not advise Judge Dancks—nor could Judge Dancks have contemplated at the time of signing—that agents intended to use either warrant or some alchemy of the two warrants together to conduct a custodial immigration dragnet of the entire NBC workforce. The government's rationalizations reveal that agents used each warrant to accomplish more than what they could have accomplished had they only obtained one or the other.

Thus, one of three scenarios must be true. One, the government was not candid with Judge Dancks in its warrant applications. Two, in planning the execution of the raid after the warrants were signed, agents disregarded the scope of authority that Judge Dancks granted. Or, three, law enforcement incompetently executed each warrant, panicked, detained everyone at the facility initially, arrested people regardless of what they discovered,[8] authored reports that misrepresented facts, and relied on those reports to charge Argentina. Regardless of which is true, this is not normal practice and good faith is not available as a defense to suppression.

The constitutional violations and more personal consequences were compounded for those, like Argentina, who were arrested without probable cause. The government does not dispute that official reports of Argentina's arrest—and a criminal complaint—had factual misrepresentations authored by agents who have been accused of unconstitutional conduct in the past. *See* Dkt. No. 23-1 at 29-30. Given the volume of people swept up into Border Patrol custody, it is far from certain that those misrepresentations are unique to Argentina's case. And beyond the infringement of legal rights, there was suffering and indignity inflicted on Argentina and dozens of others who

---

[8] Notably, the government admits that agents "did not identify all the employees through biometrics that day on the site," because the reception was "spotty." Dkt. No. 33-7 at 6.

were held for days in shameful conditions at the Station, including mothers separated from their young children and unable to contact anyone. Dkt. No. 23-16 ¶¶ 21-22, 25-29.[9] This was not a "benign" constitutional violation. It was egregious, extensive, and caused real harm.

**B.    The Court should suppress the evidence in this case.**

The government contends "that 'the identity of defendants is not suppressible under the exclusionary rule.'" Dkt. No. 33 at 23 (citing *United States v. Adegbite*, 846 F.2d 834 (2d Cir. 1988)). However, *Adegbite* was decided decades before *Pretzantzin v. Holder,* which held that the "exclusionary rule can apply to specific pieces of identity-related evidence[.]" 725 F.3d 161, 166 (2d Cir. 2013). The one sentence cited in *Adegbite* that was dicta at best (because it was preceded by a finding that no constitutional violation had occurred) has been overruled.

In any event, the government seeks to expand evidence of one's identity to include evidence used to establish alienage or deportation history—namely, Argentina's immigration file, her immigration history, and information related to her country of origin. Here, at any subsequent trial, the government would have to prove that Argentina is an alien and that she was previously deported. This evidence comes from files that were discovered only after Argentina was illegally seized and arrested. As such, that evidence is a fruit of impermissible government action and suppressible as evidence of alienage/immigration history, not identity.

The other cases the government cites involve immigration appeals, not criminal cases. As this Court has held and Judge Nardacci likewise found, a criminal defendant is entitled to seek to suppress specific pieces of tangible evidence that the government would likely attempt to introduce

---

[9] For example, but for the quick thinking of school district officials, nearly a dozen children could have been sent to empty homes after school. Natalie Mooney, *12 Fulton students affected by ICE raid; some have yet to return to school*, *Spectrum News 1*, https://spectrumlocalnews.com/nys/central-ny/news/2025/09/12/ice-raid-student-impact.

at trial. *See United States v. Morales-Lopez*, 5:25-CR-94 (BKS), Dkt. No. 47 at 7-12 (N.D.N.Y. May 5, 2025) (finding tangible identity evidence suppressible under the exclusionary rule); *United States v. Martinez-Rodriguez*, -- F. Supp. 3d --, No. 1:25-CR-00200 (AMN), 2025 WL 2355630, at *8 (N.D.N.Y. July 23, 2025) (citing cases).

The government further makes the claim that the deterrent effect is minimal because Argentina could be re-arrested if released. *See* Dkt. No. 33 at 23. However, as noted in the original motion to suppress, *Martinez-Rodriguez* explicitly rejected this argument. As Judge Nardacci explained, deterrence does not "rise and fall on the prosecution of a single criminal defendant." *See Martinez-Rodriguez*, 2025 WL 2355630, at *8.

The deterrent effect of suppression in this case is also not hypothetical. The Acting-US Attorney touted this operation days after it was executed and promised more of the same.[10] Law enforcement has every intention of repeating these aggressive immigration raids and will make the same constitutional mistakes if there is not a clear consequence to their failure here. There is, in other words, great deterrence benefit in ensuring that law enforcement officers know the bounds of their authority under the Fourth Amendment and federal immigration laws. Suppressing the tainted evidence in this case will help demarcate those bounds and deter future unlawful conduct directed at suspected aliens.

For the foregoing reasons, and those raised in the original motion papers, the Court should suppress evidence collected after Argentina's illegal seizure and dismiss this case.[11]

---

[10] *See* CBS6 Albany, *ICE agents detain 57 in Western NY worksite enforcement action*, Sept. 9, 2025 https://www.youtube.com/watch?v=ReI1qft4CA8 at 3:01 (stating "You can expect to see federal law enforcement at more worksites going forward.").

[11] As noted above, Argentina agrees with the government that an evidentiary hearing is not necessary to decide this motion. Further, if it would expedite the Court's review, Argentina is willing to forego oral argument.

Dated:          December 8, 2025                    Respectfully submitted,


By:     */s/ Paul Tuck*
        Paul Tuck, Esq.
        Bar Roll No. 520814

        Paul Tuck Attorney at Law PLLC
        P.O. Box 44
        Manlius, New York 13104
        315.314.4545
        Paul@paultucklaw.com
        www.paultucklaw.com


cc:     Michael Perry, AUSA (via ECF)
        Michael Whalen, AUSA (via ECF)
        Argentina Juarez-Lopez (via mail)